# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **T.O. and K.O., individually and as guardians *ad litem* of J.O.,** | Civ. No. 2:12-5350 (KM)(MAH), |
| **Plaintiffs,** | consolidated with |
|  | Civ. No. 2:12-6089 |
| **v.** |  |
| **SUMMIT CITY BOARD OF EDUCATION,** | **OPINION** |
| **Defendant.** |  |

## KEVIN MCNULTY, U.S.D.J.:

Plaintiffs T.O. and K.O. (the "Parents") are the parents and guardians *ad litem* of J.O. The Summit City Board of Education ("Summit") was J.O.'s school district.

This case arises from a decision by Administrative Law Judge ("ALJ") Evelyn Marose, dated June 5, 2012. *See T.O. & K.O. o/b/o J.O. v. Summit Bd. of Educ.*, OAL Dkt. No. EDS 12248-11, Agency Dkt. No. 2011-17415, 2012 N.J. Agen. LEXIS 378 (June 5, 2012) ("ALJ Decision").[1] J.O. has been primarily diagnosed with Childhood Apraxia of Speech ("CAS") and dyspraxia. J.O.'s educational disabilities make him eligible for a special education program. After reviewing the administrative record and holding numerous hearings, the ALJ found that: (1) Summit failed to provide J.O. with free appropriate public education ("FAPE"); (2) Summit failed to give careful consideration to the recommendations of the Parents and outside professionals in planning

---

[1]    The ALJ's decision is also available at ECF No. 15-3, Exhibit B. I cite to the page numbers of the Lexis citation.

J.O.'s education; (3) Summit did not offer J.O. placement in the least-restrictive environment ("LRE"); and (4) the Parents had met their burden of demonstrating that they were entitled to reimbursement for the expenses associated with sending J.O. to a private school—specifically, the Montessori Children's Academy ("MCA").

The ALJ thus ordered (1) that Summit reimburse the Parents for tuition and expenses related to J.O.'s attendance of MCA for the 2011–2012 academic year and 2012 extended year; and (2) that Summit and the Parents develop an Individualized Education Plan ("IEP") for J.O. that specifies J.O. is to attend MCA or a similar place for the 2012–2013 year and is to receive "related services."

MCA changed its program after the 2011–2012 academic year. Following this change, the Parents informed Summit that J.O. would be placed at Rainbow Montessori School ("RMS") starting in September 2012. The Parents argue that RMS is a "similar placement" to MCA and seek reimbursement from Summit for the cost of attendance at RMS. Summit disagrees and refuses to reimburse the Parents.

On August 24, 2012, the Parents commenced an action, which recited that they had prevailed in the administrative proceedings and sought attorneys' fees and costs. (Civ. No. 12-5350, ECF No. 1)

On September 28, 2012, Summit commenced a second action appealing the ALJ's decision. (Civ. No. 12-6089, ECF No. 1) In that second action, the Parents counterclaimed, alleging that Summit violated the ALJ's order and Section 504 of the Rehabilitation Act of 1973, and seeking compensatory damages as well as attorneys' fees and costs. (Civ. No. 12-6089, ECF No. 7)

The two cases, Civ. No. 12-5350 and Civ. No. 12-6089, were

consolidated on January 17, 2012. (ECF No. 11)[2]

On June 5, 2013, the Parents (aligned as defendants in the consolidated action) filed a (First) Amended Counterclaim ("FACC"). (ECF No. 19) The FACC contained new allegations that Summit violated the ALJ's order, sought a declaration that RMS constitutes J.O.'s "stay put" placement for the 2012–2013 academic year, alleged that Summit violated J.O.'s rights under Section 504 of the Rehabilitation Act of 1973, and sought compensatory damages as well as attorneys' fees and costs. (ECF No. 18) The Parents' new claims were based on Summit's refusal to reimburse the Parents for the costs of the MCA or RMS.

On December 17, 2014, Magistrate Judge Hammer entered an order granting the Parents leave to file a Second Amended Counterclaim that would include claims under the New Jersey Law Against Discrimination ("NJLAD"). (ECF No. 66) That order also denied without prejudice the Parents' motion to add a punitive damages claim against Summit. (*Id.*) On January 15, 2015, the Parents filed the Second Amended Counterclaim ("SACC"). (ECF No. 68)

On March 10, 2015, Judge Hammer entered a consent order dismissing with prejudice Parents' claims for compensatory damages relating to pain, suffering, emotional distress, and mental anguish in their Counts XI, XII, XIII, and XIV. (ECF No. 86)

The Parents have moved for leave to file a Third Amended Counterclaim to add a punitive damages claim against Summit. (ECF No. 70) That motion remains pending and has been referred to Judge Hammer. It is not pertinent to the discussion here.

I have decided, within my discretion, to limit this opinion to what amounts to Summit's appeal of the ALJ's decision. The grounds I decide

---

[2]     Unless otherwise specified, ECF citations below all refer to the docket in the earlier-filed of the two consolidated cases, Civ. No. 12-5350.

in this opinion, then, are

> (1) Summit's motion for summary judgment on its original claim
> (Civ. No. 12-6089, ECF No. 1) that the ALJ's decision should be
> vacated. (This represents a portion of the motion filed as ECF
> No. 35.)

> (2) Parents' opposition to Summit's motion for summary judgment
> and their cross-motion for partial summary judgment on
> Summit's claim that the ALJ's decision should be vacated.
> (ECF No. 39)

For the reasons stated below, the ALJ's June 5, 2012 opinion is AFFIRMED. Summit's motion for summary judgment (ECF No. 35) is accordingly DENIED in part, and summary judgment is GRANTED to the Parents on Summit's claim that the ALJ's opinion should be vacated (Civ. No. 12-6089, ECF No. 1).

The validity of the ALJ's order, decided here, is an issue that affects all others. Still pending before the court are additional dispositive motions relating to the Parent's claims for attorneys' fees and counterclaims. They are:

> (3) Parents' motion for summary judgment on their original claim
> for attorneys' fees and costs (Complaint, ECF No. 1). (ECF No.
> 33)

> (4) Parents' motion for summary judgment on Counts III, IV, and VI
> of their SACC.[3] (ECF No. 34)

> (5) Summit's motion for summary judgment against the Parents on

---

[3]     Technically, the Parents's motions relate to their (First) Amended Counterclaim ("FACC," ECF No. 18) in this motion. However, the Parents' subsequently filed Second Amended Counterclaim ("SACC," ECF No. 68) incorporating all of the claims asserted in the FAC, with the exception that the Parents no longer seek prospective relief regarding an academic placement for J.O. for 2013–2014 and subsequent years. (*See* SACC ¶202) Therefore, all references herein to the SACC may be deemed to apply to the FACC as well.

Counts III, IV, and V of the Parents' SACC. (This represents the remainder of the motion filed as ECF No. 35. *See* paragraph 1, *supra*.)

(6) Parents' motion for summary judgment on Counts I, II, VII, IX, X, XI, XII, XIII, and XIV of their SACC. (ECF No. 82)

(7) Parents' motion for summary judgment on Count VI of their SACC. (ECF No. 83)

As to these additional motions, I am reserving decision. I will order the parties to confer with the Magistrate Judge to set an agenda as to what remains to be decided and to determine whether any of the arguments should be withdrawn or reformulated in light of what has been decided here.

## I.   BACKGROUND

### a. Facts[4]

J.O. is a boy who began receiving special education services from Summit in May of 2010, when he was three years old. (Def. 35 SMF ¶1) At that time, J.O. was eligible for special education services as a "pre-school child with a disability." (*Id.* (citing N.J.A.C. 6A:14–3.5(c))) The ALJ opinion concerns his education during the 2009–2010 and 2010–2011

---

[4]     I set forth the facts, noting those agreed upon or disputed in the parties' L. Civ. R. 56.1 Statements.

Citations to the Rule 56.1 Statements, moving papers, and exhibits are as follows.

Def. 35 SMF = Summit's Statement (ECF No. 35-1)

Pl. 35 RSMF = Parents' Response (ECF No. 39-2)

Def. 35 Mot. = Summit's Motion (ECF No. 35-2)

Pl. 35 Opp. = Parents' Opposition (ECF No. 39-1)

Def. 35 Reply = Summit's Reply (ECF No. 45)

Fabian Cert. = Certification of Marie-Laurence Fabian, Esq., in support of Summit's motion for summary judgment, ECF No. 35-3. Exhibits to the Fabian Cert. are available as attachments 6 through 14 to ECF No. 35.

school years. (*Id.*)

J.O. has been diagnosed with Childhood Apraxia of Speech ("CAS"), dyspraxia, coordination disorder, hypotonia, vestibulary and processing issues, and differences in proprioception. ALJ Decision *3.

"CAS is a neurological condition that relates to the total lack of ability to plan, to organize, to sequence, and to execute movements necessary to produce speech. Dyspraxia is a neurological condition where sensory information is not reliably received and/or processed so that ways of doing things that worked cannot be applied to new situations. Coordination problems often accompany the diagnosis." ALJ Decision *3.

### i. Evaluations of J.O. (CSH and Battelle)

In June of 2009, J.O. was evaluated by the Children's Specialized Hospital ("CSH") Early Intervention Program. (Def. 35 SMF ¶3) J.O. was found eligible for the program based on a finding that he had at least a 25% delay in at least two of the "developmental areas of fine motor, cognitive, communication or social/emotional." (*Id.*)

Rather than enrolling J.O. in the Early Intervention Program, the Parents sought out private therapists for him. (*Id.* ¶4)

In January of 2010, the Parents met with Summit's Psychologist, Learning Disabilities Teacher Consultant ("LDTC"), Social Worker, Speech and Language Therapist, Physical Therapist, and Occupational Therapist. (*Id.* ¶5) The Psychologist, LDTC, Social Worker, and Speech and Language Therapist (referred to as the Child Study Team ["CST"]) conducted a Collaborative Evaluation of J.O. (*Id.* ¶6). The CST also administered the Battelle Developmental Inventory, which is "a standardized, individually administered assessment battery of key developmental skills," characterized as "Adaptive, Personal-Social,

Communication, Motor, and Cognitive" skills. (*Id.*) J.O.'s scores in all of these areas fell under the category of "significant developmental delay." (*Id.* ¶13)

The Parents argued before the ALJ that the Battelle evaluation severely underestimated J.O.'s abilities. They cited to expert testimony that the Battelle evaluation at times requires children to respond on demand, and J.O.'s disabilities cause "impairments in volitional movement." (Pl. 35 RSMF ¶7 (citing Fabian Cert. Ex. NN at 55:11–56:9)) Specifically, J.O.'s apraxia prevents him from being able to respond on demand or respond when he feels pressure. (*Id.*) The Parents thus argue that J.O. was actually able to perform many of the skills that the CST determined he could not perform.

Summit also reviewed a Comprehensive Autism Team Evaluation Summary from the CSH team, which concluded that J.O. did not meet the criteria for an autism diagnosis. (Def. 35 SMF 17–19) The CSH team concluded that J.O. had receptive and expressive language difficulties and sensory processing difficulties. (*Id.* ¶¶20–21) Based on their findings, the CSH team recommended that J.O. attend a full day pre-school disabled program focused on "improving communication, enhancing socialization and eliminating unwanted behaviors." (*Id.* ¶22 (citing Fabian Cert. Ex. H at 3))

ii.   The eligibility meeting

On April 23, 2010, the Parents and J.O.'s private speech therapist, Anne Toolajian, met with Summit's CST and Summit's teachers and related services providers to discuss J.O.'s placement. (This will be referred to as the "eligibility meeting.") (*Id.* ¶¶24–25) Before the eligibility meeting, J.O.'s mother (K.O.) spoke to Ms. Adam—J.O.'s Case Manager from Summit—to voice her objections to the Battelle evaluation. (*Id.* ¶26) K.O. also informed Summit of her objections to the Battelle evaluation in

a letter dated May 6, 2011. (*Id.* ¶27) That letter included a copy of the CSH report based on an evaluation of J.O. in July 2009. (*Id.*)

Before the eligibility meeting, Summit informed the Parents of the pre-school programs in the district, which included: (1) the half day inclusion class; (2) the half-day (non-ABA) self-contained pre-school disabled class ("PSD class"); and (3) the self-contained pre-school disabled class based upon the principles of Applied Behavior Analysis ("ABA class"). (*Id.* ¶30) Summit favored placing J.O. in the ABA class, so the Parents were invited to observe that class, which they did. (*Id.* ¶31)

### iii.   Developing an Individualized Education Plan (IEP)

The Parents and Summit next met to develop an Individualized Education Plan for J.O. (*Id.* ¶34) Summit proposed that J.O. attend the full-day program in the ABA class and receive related services, including speech and language therapy, occupational therapy, physical therapy, and consultation with a behaviorist. (*Id.*) The Parents did not object to J.O. attending the ABA class, but expressed their concern that a full day would be too much for J.O., and stated their desire for J.O. to continue with his private therapies. (*Id.*) On May 7, 2010, the Parents and Summit agreed to J.O.'s first IEP, which provided that J.O. would attend the ABA class, but only in the afternoon. (*Id.* ¶¶38, 42) They agreed to reevaluate J.O.'s IEP in July of 2010. (*Id.* ¶41) J.O. did attend the afternoon session of the ABA class Mondays through Thursdays[5] from May 2010 through June 2010. (*Id.* ¶39; Pl. 35 RSMF ¶39)

In July of 2010, the Parents and Summit met to discuss J.O.'s next IEP. (Def. 35 SMF ¶43) Summit's position is that J.O. "was displaying some targeted skills, but not consistently." (*Id.*) Summit recommended that J.O. remain in the ABA class and renewed its

---

[5]     On Fridays, the ABA class only met in the morning; there was no afternoon session for J.O. to attend. (Def. 35 SMF ¶40)

8

suggestion that he attend full-time. (*Id.* ¶¶43–45) The Parents, however, maintain that J.O. was functioning at a level higher than that found by Summit. They cite the comments of J.O.'s teacher that he was able to consistently demonstrate certain skills, such as returning greetings and sitting in an appropriate group. (Pl. 35 RSMF ¶43) The Parents wanted J.O. to attend the ABA class part-time, worrying that J.O. would not have the stamina to attend full-time. (Def. 35 SMF ¶46) On August 12, 2010, the Parents consented to an amended IEP that extended J.O.'s time in the ABA class slightly, as a preferable alternative to having J.O. attend full-time. (*Id.* ¶¶47–48)

On October 15, 2010, the Parents and Summit met again to discuss J.O.'s IEP. (*Id.* ¶49) Summit once again proposed that J.O. attend the ABA class full time. (*Id.* ¶50) After the meeting, the Parents consulted with private therapists. Then they requested that J.O. be allowed to transition to the PSD class, which is a less restrictive environment than the ABA class. (*Id.* ¶¶52–53) Summit contends that this was a new request. (*Id.*) The Parents respond that, since May of 2010, the plan was always for J.O. to transition to the PSD class eventually. (Pl. 35 RSMF ¶53) They say Summit knew that was the plan all along, and that Summit promised J.O. would be transitioned to the PSD class after just a short time in the ABA class. Nevertheless, they say, Summit refused to transition J.O. to the PSD class unless he started attending the ABA class full time. (*Id.*)

By letter dated November 23, 2010, the Parents once again raised with Summit their concerns regarding the ABA class. They argued that the ABA class did not "provide for peer language models or social interaction with typically developing peers." (Def. 35 SMF ¶54) The Parents also provided Summit with CSH reports from July 2009 and January 2010 in support of their request. (*Id.* ¶¶55–62)

On November 23, 2010, the Parents and Summit met again to

discuss J.O.'s IEP. (*Id.* ¶63) Summit once again proposed that J.O. attend the ABA program full time. (*Id.* ¶¶63–64) The Parents resisted, noting that their private therapist, Ms. Alicia Parson, did not agree that the ABA class offered the kind of language-rich environment that Summit claimed. (Pl. 35 RSMF ¶64) K.O. also observed the ABA class, where she says she saw little social interaction. (*Id.*) The parties agreed to another short-term IEP, which provided that J.O. would attend the PSD class for forty-five minutes each day and Summit would monitor his progress there. (Def. 35 SMF ¶65)

J.O.'s ABA teacher observed him in the PSD class. She opined that the pace of the PSD class was too quick, and that the class did not offer sufficient individualized instruction for J.O. (*Id.* ¶67) Summit's Behaviorist similarly thought J.O. was not ready to attend the PSD class and concluded that J.O.'s attendance at the PSD class was not resulting in progress in his functioning. (*Id.* ¶¶68–71) The Parents say that these evaluations were suspect because they were done for short periods of time when J.O. had just started attending the PSD class. (Pl. 35 RSMF ¶¶67–71)

After the November 23, 2010 IEP meeting, the Parents informed Summit that (1) they disagreed with Summit's refusal to place J.O. in the PSD class for more than forty-five minutes; and (2) they would allow the IEP to go into effect, but they would unilaterally remove J.O. from his classes twice a week at 1pm so that J.O. could attend private therapy. (Def. 35 SMF ¶72)

From August 2010 through February 2011, J.O.'s Parents kept a log of their impressions of J.O. (*Id.* ¶74; Pl. 35 RSMF ¶74) The Parents shared this log with Summit. They told Summit that J.O. was unhappy and did not like going to school anymore. (*Id.*) Summit agreed that J.O. would sometimes get upset and cry when he was entering school—in particular, when he was not allowed to open doors himself. Summit

maintained, however, that J.O. could be quickly redirected to his classroom and that he stopped crying once inside the building. (Def. 35 SMF ¶75) The Parents disagreed, stating that J.O. was not easily redirected, was not fine, and was upset at other times—not just when he was not allowed to open doors. (Pl. 35 RSMF ¶75)

Summit and the Parents also disagree as to whether J.O.'s behavior changed over time as he attended the ABA class. The Parents claim that J.O. regressed in his behavior, began avoiding school, and experienced changes in behavior that interfered with his learning. Summit disputes this, saying its employees did not observe any change in J.O.'s behavior. (Def. 35 SMF ¶76; Pl. 35 RSMF ¶76)

The Parents also disagree with Summit's position that J.O. progressed in ABA program. Summit claims, based on a January 2011 Progress Report, that J.O. made progress on his IEP goals, mastered several goals in his program, and "communicat[ed] more intentionally with different modalities." (Def. 35 SMF ¶¶78–82) The Parents dispute this. They say J.O. did not make any progress in the ABA program. The Parents clarify that the tasks J.O. supposedly "mastered" were ones he was already doing at the start of the program, and that J.O.'s preexisting capabilities generally exceeded the goals that Summit set for him. (Pl. 35 RSMF ¶¶78–82)

On January 28, 2011, the Parents and Summit met again to discuss J.O.'s IEP. (Def. 35 SMF ¶87) Summit once again proposed that J.O. attend the ABA program full-time and spend forty-five minutes each day in the PSD class. (Id. ¶88) The Parents disagreed with this recommendation. On March 2, 2011, the Parents informed Summit through their counsel that they were removing J.O. from Summit's program. (Id. ¶89) J.O. left Summit on March 8, 2011, without an alternative placement. (Id.)

iv.  Alicia Parson's report and April 2011 IEP meeting

The Parents had Alicia Parson, a speech and language pathologist, evaluate J.O. (*Id.* ¶90) Ms. Parson observed J.O. in his ABA and PSD classes on January 4, 2011, and in a speech and language therapy session on February 4, 2011. (*Id.* ¶91) She concluded that J.O. had "a mild impairment in receptive language skills, . . . a profound articulation and expressive language disorder . . . and a diagnosis of Childhood Apraxia of Speech." (*Id.* ¶90 (citing Fabian Cert. Ex. BB 16, 20)) The Parents note that Ms. Parson was in "complete disagreement with [Summit's] decision to use an ABA based program to address J.O's needs." (Pl. 35 RSMF ¶92 (citing Fabian Cert. Ex. BB 12, 14)) Ms. Parson's evaluation was provided to Summit on March 14, 2011. (*Id.* ¶91)

On April 4, 2011, Summit and the Parents met to discuss Ms. Parson's report and J.O.'s IEP. (*Id.* ¶92) Summit proposed a few changes to the IEP based on Ms. Parson's report, but did not increase the time that J.O. would have spent in the PSD class. (*Id.* ¶¶95–97; Pl. 35 RSMF ¶¶95–97) The Parents rejected this IEP on May 4, 2011. They told Summit they would continue to seek a different placement for J.O. (Def. 35 SMF ¶98)

On June 16, 2011, the Parents informed Summit that J.O. would be attending Harbor Haven day camp in July and MCA in September. (*Id.* ¶99) Summit denied the Parents' request for funding for these placements. (*Id.* ¶100) The Parents declined to participate in Summit's IEP for J.O. in 2012. (*Id.* ¶¶101–104)

The Parents brought their case before the State of New Jersey Office of Administrative Law. They sought reimbursement for tuition and expenses incurred during the 2011–2012 academic year and the 2012

extended year at MCA. The Parents also requested that J.O. be placed in a program similar to MCA for the 2012–2013 school year.

### b. ALJ's decision

The ALJ thoroughly reviewed the record and held hearings on January 11, January 25, January 26, January 27, February 22, March 5, March 7, March 14, and March 30, 2012. The ALJ made the following findings based on the evidence presented:

First, the ALJ found that Summit had failed to provide J.O. with free appropriate public education ("FAPE"). ALJ Decision *53. The ALJ found that Summit used inappropriate testing to assess J.O.'s abilities; that Summit relied too heavily on one assessment; that Summit's program for J.O. failed to meet his individual needs; that Summit's program was not tailored to J.O.'s specific disabilities; and that J.O. "did not receive any meaningful access to education or benefit from the program offered by the District." *Id.* *53–54.

Second, the ALJ determined "that the District failed to give careful consideration to the recommendations of the parents and outside professionals and did not allow the parents a large measure of participation in developing the child's IEP and assessing its effectiveness." ALJ Decision *57–58. The ALJ found that the Parents repeatedly attempted to cooperate with Summit, but that Summit did not incorporate most of their requests into J.O.'s program and was rigid in its adherence to an inappropriate educational program. *Id.* *55–58.

Third, the ALJ found that "the District did not offer J.O. placement in the least-restrictive environment." *Id.* *61. Summit's own witnesses, she found, suggested that J.O. was able to function in a less restrictive environment than the one into which he was placed. *Id.* *62.

Fourth, the ALJ found that the Parents had met their burden of

13

demonstrating "an entitlement to reimbursement for the expenses attached to J.O.'s attendance at the MCA." *Id.* *65. Specifically, the Parents had shown that J.O. made significant educational and social progress after he entered into the MCA program. (*Id.*)

Based on her findings, the ALJ ordered the following relief:

(1) that the District reimburse petitioners for tuition and expenses related to J.O.'s attendance at the Montessori Children's Academy for the 2011–12 academic year and for the 2012 extended year; and . . .

(2) that the District and petitioners develop an IEP that includes a program in an appropriate educational setting for the 2012–13 academic year commensurate with petitioners' experts' recommendation at either the Montessori Children's Academy or in a similar placement that includes an inclusion classroom with a small number of students, who are same-aged, and as verbal if not more verbal than he, with related services including speech, occupational and physical therapy, and an aide.

(*Id.* 65–66)

This Court has jurisdiction over this appeal pursuant to 20 U.S.C. § 1415(i)(2) and 28 U.S.C. § 1331.

## II.   THE IDEA STATUTE

IDEA's purpose is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designated to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). States have an obligation to ensure that children with disabilities receive a "free appropriate public education," or "FAPE," 20 U.S.C. § 1412(a)(1), in the form of special education "provided at public expense, under public supervision and direction." 20 U.S.C. § 1401(8). Such special education will be provided

14

"in conformity with the individualized education program ["IEP"] required under Section 1414(d) of this title." *Id.*

A "child with a disability" is a "child [] with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness) . . . other health impairments, or specific learning disabilities, and [] who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3).

A specific learning disability (or "SLD") is "a disorder in 1 or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, read, write, spell, or do mathematical calculations . . . includ[ing] perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and development aphasia." 20 U.S.C. § 1401(30); N.J.A.C. § 6A:14-3.5(c)(12).

### III.   SUMMARY JUDGMENT AND ALJ APPEALS: STANDARDS

#### a.   Summary judgment in general

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Daniels v. Sch. Dist. Of Phila.*, No. 14-1503, 2015 WL 252428, at *6 (3d Cir. Jan. 20, 2015). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *Heffernan v. City of Paterson*, No. 14-1610, 2015 WL 265514, at *2 (3d Cir. Jan. 22, 2015). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, (1986). "[W]ith respect

15

to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The existence, or not, of a genuine, material issue must be considered in light of the ultimate burden of proof—here, proof by clear and convincing evidence. *See* p. 14, *infra*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 244 (1986) (the "clear and convincing" standard must be considered on a motion for summary judgment).

If the moving party meets its threshold burden, the opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial.").

When the parties file cross-motions for summary judgment, the governing standard "does not change." *Clevenger v. First Option Health Plan of N.J.*, 208 F. Supp. 2d 463, 468–69 (D.N.J. 2002) (citing *Weissman v. U.S.P.S.*, 19 F. Supp. 2d 254 (D.N.J. 1998)). The court must consider the motions independently, in accordance with the principles outlined above. *Goldwell of N.J., Inc. v. KPSS, Inc.*, 622 F. Supp. 2d 168, 184 (2009); *Williams v. Philadelphia Hous. Auth.*, 834 F. Supp. 794, 797 (E.D. Pa. 1993), *aff'd*, 27 F.3d 560 (3d Cir. 1994). That one of the cross-motions is denied does not imply that the other must be granted. For each motion, "the court construes facts and draws inferences in favor of

16

the party against whom the motion under consideration is made" but does not "weigh the evidence or make credibility determinations" because "these tasks are left for the fact-finder." *Pichler v. UNITE*, 542 F.3d 380, 386 (3d Cir. 2008) (internal quotation and citations omitted).

### b. Summary judgment on appeal of ALJ decision

The parties' briefs cite the general Fed. R. Civ. P. 56 standard for summary judgment. There are, however, some specialized considerations in this context. "[T]he term 'summary judgment' in the context of an IDEA case has a different meaning than it has in a typical Rule 56 motion. The motions filed by each party might more accurately have been titled 'motion for judgment under the IDEA.'" *D.C. v. Mount Olive Twp. Bd. of Educ.*, No. CIV. 12-5592 KSH, 2014 WL 1293534, at *16 (D.N.J. Mar. 31, 2014), *appeal dismissed* (Sept. 18, 2014) (quoting *Alex R. v. Forrestville Valley Cmty. Unit Sch. Dist. # 221*, 375 F.3d 603, 611 (7th Cir. 2004)). "[W]hen there is no new evidence presented to the district court, as in this case, the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *M.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (internal quotations and citations omitted), *aff'd*, 65 F. App'x 404 (3d Cir. 2003).

Under IDEA, district courts must give "'due weight' to the underlying administrative proceedings." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 243 (3d Cir. 2012) (citations omitted). A reviewing court must "accept the state agency's credibility determinations unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion." *Id.* (internal quotations and citations omitted). Conclusions of law are given plenary review. *Id.* Factual findings, such as whether a school district fulfilled its FAPE obligations, are reviewed for clear error. *Id.* Such ALJ findings "are to be considered prima facie correct, and if [a court does] not adhere to those findings, [it] must explain why." *Id.*

(internal quotations and citations omitted).

"[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (U.S. 1985) (internal quotations and citations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574.

All of that said, the reviewing court cannot *merely* defer to the ALJ. A district court "does not use the substantial evidence standard typically applied in the review of administrative agency decisions, but instead must decide independently whether the requirements of the IDEA are met." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 757 (3d Cir. 1995) (internal quotation and citation omitted). The party seeking relief or challenging the administrative decision bears the burden of persuasion. *D.K.*, 696 F.3d at 243 (citations omitted).

Although the Parents have not moved separately for summary judgment,[6] the Court can, in its appellate role, grant judgment to the Parents *sua sponte* if that is warranted, provided the losing party was on notice and had the opportunity to present relevant evidence. *See* Fed. R. Civ. P. 56(f); *Anderson v. Wachovia Mortgage Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) ("'[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her

---

[6]     The Parents title ECF No. 39 as their "Opposition to the Summit Board of Education's Motion for Summary Judgment and [] Support of Cross-Motion for Partial Summary Judgment [as to their counterclaims]." From context, it seems that the Parents ask for summary judgment as to Summit's claim as well. (*See* Pl. 35 Opp. 40 ("The decision of the ALJ is factually and legally unassailable, and Judgment on the Administrative Record should be entered against the District.")) However, in an abundance of caution, I note that I would grant the Parents judgment *sua sponte* if this document had not asked for it.

18

evidence.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986)));
*D.C.*, 2014 WL 1293534, at *17 (granting judgment, *sua sponte*, to a
nonmoving party in a review of an ALJ decision).

Summit has presented all evidence relevant to its appeal, and the
Parents have made a mirror-image summary judgment motion. To deny
Summit's appeal of the ALJ's decision is tantamount to granting the
Parents' request for affirmance. For the reasons expressed below,
judgment will be granted to the Parents on Summit's claim.

## IV.   APPEAL OF ALJ'S DECISION: ANALYSIS

Summit asks this Court (1) to reverse the ALJ's determination, and
find that Summit at all relevant times provided J.O. with an appropriate
education in the least restrictive environment; and (2) to direct that J.O.
be placed in Summit's program. (Compl. Prayer for Relief; Def. 35 Mot.)
Summit considers many of the ALJ's findings to be erroneous and
disputes the ALJ's characterization of evidence. For the reasons
explained below, I do not find any of the ALJ's findings to be clearly
erroneous.

   i. Challenged finding 1: Summit failed to provide J.O.
      with FAPE.

Summit challenges five subsidiary factual findings on which the
ALJ relied when she determined that Summit failed to provide J.O. with
FAPE. (Def. 35 Mot. 4–17; *see* ALJ Decision at *53-61) These challenges
cannot be sustained in the face of the applicable standard of review.

   1. *ALJ's discrediting of the Battelle evaluation*

Summit argues that the ALJ erred in finding that Summit relied
too heavily on the results of the Battelle evaluation in assessing J.O.'s
abilities. ALJ Decision *53. I am unpersuaded.

Summit criticizes the ALJ's reliance on the testimony of J.O.'s
private therapists, who indicated that J.O.'s low Battelle results did not

19

accurately reflect his abilities. (Def. 35 Mot. 4 (quoting Fabian Cert., Ex. SS at 6)) These were not isolated or outlying opinions, however. All of J.O.'s treating therapists (Miriam Cohen, Anne Toolajian, and Shelia Smith Allen) testified that J.O.'s low Battelle score was "not the result of [J.O.'s] lack of cognitive ability, but rather was a result of his disability." ALJ Decision *10.

Summit calls the testimony of J.O.'s private speech therapist, Ms. Toolajian, "absurd" and "highly questionable." (Def. 35 Mot. 5) Summit does not, however, point to evidence that discredits Ms. Toolajian. The ALJ acted well within the bounds of her discretion in finding Ms. Toolajian credible. *See D.K.*, 696 F.3d at 243.

Next, Summit questions the ALJ's reliance on the testimony of J.O.'s mother regarding the Battelle evaluation. (Def. 35 Mot. 9; ALJ Decision *7 n.1) Summit argues that this testimony was not specifically supported by other evidence. Again, I defer to the ALJ's weighing of the witnesses' testimony, since it does not fly in the face of any non-testimonial, extrinsic evidence. *See D.K.*, 696 F.3d at 243.

Summit says that the ALJ misinterpreted J.O.'s private occupational therapist, Ms. Sheila Allen, as saying that J.O. "was not physically able to respond to the demand format of the Batelle [*sic*]." ALJ Decision *11. Indeed, according to Summit, Ms. Allen "did not testify about the Battelle." (Def. 35 Mot. 6) The ALJ, however, did not state that Ms. Allen testified about the Battelle as such; rather, as the ALJ noted, Ms. Allen testified about J.O.'s ability to respond to *the demand format* of the Battelle—that is, his ability to articulate a response to questions on demand.[7] ALJ Decision *11. The thrust of Ms. Allen's testimony, as the

---

[7]     Summit also argues that the Battelle included more than one demand format—that is, the Battelle tested both verbal and nonverbal means of expression. This is not contrary to the ALJ's finding. The fact that the Battelle used *more* than one demand format does not mean expert testimony that J.O. was unable to respond to one of the Battelle's demand formats is irrelevant.

ALJ correctly noted, was that J.O.'s brain does not provide him with "reliable, dependable information about what his physical self is doing." *Id.*; (Fabian Cert. Ex. WW 170:14–16) It is reasonable to conclude from this that J.O. would have difficulty responding on demand to the Battelle questions or, I suppose, to other kinds of questions as well.

Summit says the ALJ wrongly believed that the Battelle was Summit's "sole criterion" in developing J.O.'s program. (Def. 35 Mot. 7–8) The ALJ, however, does not state that the Battelle test was the sole criterion; she states that Summit "relied heavily" on the Battelle. ALJ Decision *53.

Summit asserts that the ALJ unfairly discounted certain portions of the Battelle evaluation. (Def. 35 Mot. 8–9) The ALJ pointed to two apparent anomalies in the evaluation. First, the Collaborative Evaluation portion did not reflect that J.O. had the ability to identify family members and pets, indicate his needs, and say "yes." The Parents, however, had informed the CST that J.O. was capable of all of these things. ALJ Decision *7–8. Second, J.O. was characterized as aggressive based on his behavior on the first day of the evaluation. Later evaluations, however, described him as adorable, sociable and friendly. The Parents explained that, on the morning of the first day, they had rushed J.O., who missed breakfast. ALJ Decision *5–9. Summit stresses that there was no evidence that J.O. did *not* act aggressively on that particular day. (Def. 35 Mot. 8–9)

I do not suggest that the ALJ could not have agreed with Summit. But the ALJ acted within her discretion in concluding, based on this evidence, that the Battelle did not give a full and rounded view. Where there are two permissible views of evidence, the ALJ's choice between them is not clearly erroneous. *See Anderson*, 470 U.S. at 574. And in the absence of any contradictory non-testimonial, extrinsic evidence that would render such credibility determinations unreasonable, I will defer to

21

the ALJ. *See D.K.*, 696 F.3d at 243.

         2.   *ALJ's statement regarding the first portion of the assessment from CSH*

      Summit contends that the ALJ misapprehended the basis for Summit's decision that J.O. would most appropriately be placed in a class containing mostly autistic students. According to Summit, the ALJ believed incorrectly that Summit relied *solely* "on the first portion of the assessment from CSH—which was based solely on an interview of the parents suggesting that [J.O.] might be autistic—in support of its decision to place J.O. in a class where the majority of the students were autistic and the method of teaching was using [the] princip[le]s of behavior analysis, favored for use with autistic students." (Def. 35 Mot. 10–13) In fact, however, the ALJ wrote that Summit "*referenced* the first portion of the assessment." The ALJ did not state that Summit relied heavily, or solely, on it. (ALJ Decision *54; *see* Pl. 35 Opp. 20.)

      Summit goes on to criticize the ALJ for rejecting testimony of Summit's witnesses: Ms. Negvesky (J.O.'s ABA teacher) and Craig Domanski (Summit's Behaviorist). Summit also criticizes the ALJ for crediting certain testimony of the Parents' witnesses: Ms. Parson and Ms. Toolajian. (Def. 35 Mot. 10–13) As to its own witnesses, Summit exaggerates somewhat in stating that the ALJ rejected their testimony. What the ALJ actually wrote is that it was "at worst . . . disappointing" that Summit's witnesses had memory lapses as to a few questions.[8] ALJ Decision *47 (emphasis added). She explicitly did "not find that any witnesses' testimony should be totally disregarded, based upon

---

[8]     Nor did the ALJ lack a basis for stating that some of Summit's witnesses "had difficulty remembering facts relating to J.O. and sometimes made conflicting statements." *Id.* *47. (*See, e.g.*, Fabian Cert. Ex. P 40:3–41:4 (Mr. Domanski identifying J.O.'s failure to clap as a negative behavior despite evidence that J.O. could not clap due to his disability; Fabian Cert. Ex. B 122:2–19, 148:8–13, 151:6–152:2 (ALJ reminding Ms. Diamant to testify from memory rather than read the documents in front of her))

credibility." *Id.* As to the Parents' witnesses, Summit points to contradictions and other alleged flaws. This, however, was a classic credibility determination by the ALJ as fact finder. In the absence of any contradictory non-testimonial, extrinsic evidence that would render such credibility determinations unreasonable, I defer to the ALJ. *See D.K.*, 696 F.3d at 243.

I find no error in the ALJ's statement regarding Summit's reliance on the CSH or in her credibility determinations.

### 3. ALJ's description of J.O.'s ABA class

Third, Summit argues that the ALJ mistook the number of students in J.O.'s ABA class. (Def. 35 Mot. 13) Summit cites to the deposition transcript of J.O.'s ABA teacher, Ms. Negvesky, in which she stated that, of the six students in her ABA class, about half were diagnosed with autism. (Fabian Cert. Ex. K at 125:14–21). The ALJ's exact statement was that "three of the five children in her ABA class *with J.O.* had been diagnosed with autism." ALJ Decision *19 (emphasis added).

From the context, it is clear that Ms. Negvesky counted six children in her class *including* J.O. and that the ALJ counted five children in the class *in addition to* J.O.

### 4. ALJ's description of verbal communication in ABA class

Fourth, Summit disputes the ALJ's statement that "while the District characterizes the ABA program as language rich, little communication was between classmates. Verbal communication was almost exclusively between a teacher or aide and individual students rather than between class members." (ALJ Decision *19; Def. 35 Mot. 14) Summit points to evidence that "language rich" is a term of art meaning that language is "always modeled and prompted" by teachers and that a teacher or aide "facilitate[s] language." (Def. 35 Mot. 14 (citing Fabian

23

Cert. Ex. K 165–166; 46:5–11)) Summit also cites the testimony of Ms. Toolajian, J.O.'s private speech therapist, who explained that a language rich environment is one "where everything that's presented is also presented with requests . . . to use language all the time with the teachers, with the assistants, with the classmates." (Fabian Cert. Ex. WW 50:18–23; Def. 35 Mot. 14) In any event, says Summit, the ABA teacher *did* "contrive situations where students had talked to each other, requested things from each other, [and] asked for help." (Def. 35 Mot. 14 (citing Fabian Cert. Ex. K 79:13–15))

I repeat that, to challenge the ALJ's findings, it is not sufficient to point to one or another bit of evidence to the contrary. In light of the record, it was permissible for the ALJ to conclude that such a classroom had limited peer-to-peer interaction. Half of the students were diagnosed with autism, teachers and aides had to model how to use language, and peer-to-peer interactions had to be "contrived" by the teachers and aides. Additionally, Ms. Parson testified to not seeing "real strong engagement being encouraged between [J.O.] and the other children in the class," and K.O. testified that she observed little social interaction between the students in the ABA class. (Fabian Cert. Ex. NN 111:16–21; Ex. P 223:22–224:11)

Based on this evidence, the ALJ's interpretation is permissible and therefore not erroneous. *Anderson*, 470 U.S. at 574.

### 5. ALJ's conclusion that Summit's program did not meet J.O.'s needs

Fifth, Summit argues that the ALJ erroneously concluded (1) that Summit's program for J.O. "was not designed to meet his individual needs"; (2) that the program was "not tailored for his disabilities, including, but not limited to his diagnoses of CAS/severe speech and language disorder, and low-tone and motor coordination issues"; and (3) that "J.O. did not receive any meaningful access to education or benefit

from the program offered by the District." ALJ Decision *54; (Def. 35 Mot. 15–17)

Summit says that the IEPs developed for J.O. included speech and language therapy, occupational therapy, and physical therapy. It also says that the IEPs were developed based on J.O.'s testing results and included goals for each testing area in which J.O. experienced a delay. (Def. 35 Mot. 15–16) Summit also cites to Ms. Negvesky's statements that J.O. had made "satisfactory" and "consistent" progress with respect to his IEP goals and Ms. Gitlitz's statement that J.O. was "communicating more intentionally with different modalities" after some time in the ABA program. (*Id.* 17 (citing Fabian Cert. Ex. K 100:8–22, 113:16–25, 198:2–11))

Even accepting all of Summit's cited evidence, this argument is not persuasive, as there is sufficient evidence to the contrary in the record. Specifically, the ALJ found based on Ms. Parson's testimony that "placing an apraxic child in a program wherein he is required to respond to stimulus is setting that child up for failure" because "[a]praxic children have great difficult doing things on demand, and this is magnified when they feel pressure." ALJ Decision *34; (*see* Fabian Cert. Ex. NN 55:8–56:9) Ms. Parson also explained that J.O.'s preoccupation with doors was not dealt with appropriately in the ABA classroom, that J.O. functioned much better outside of school than when she observed J.O. in his class, and that the ABA classroom was not an appropriate setting for a child with J.O.'s disabilities. ALJ Decision *35–36; (*see* Fabian Cert. Ex. NN; 74:8–14; 86:21–87:10; 99:8–101:15; 109:24–111:21; 172:17–177:5; 177:6–178:9; 184:11–185:15; 216:17–21) Ms. Toolajian "concurred with [Ms.] Parson regarding J.O.'s diagnoses, level of functioning, and academic needs." ALJ Decision *36. And, the Parents repeatedly informed Summit that J.O. was regressing in the ABA class and that J.O. functioned much better in the PSD class. ALJ Decision *21–31.

The weight of the evidence supports the ALJ's finding that Summit's program for J.O. was not tailored to meet his needs. At best, Summit has pointed to a record that would permit a finding either way. Under the applicable standard of review, there is no error.

> ii. Challenged finding 2: Summit "failed to give careful consideration to the recommendations of the parents and outside professionals and did not allow the parents a large measure of participation in developing the [J.O.'s] IEP and assessing its effectiveness." ALJ Decision *57–58.

Summit challenges the ALJ's finding that Summit failed to carefully consider opinions of the Parents and their hired professionals. (Def. 35 Mot. 17–24)

Summit says that it did take the Parents' considerations into account when formulating J.O.'s IEPs, but that the parties had a "good faith disagreement" as to the best approach for educating J.O. In support of its decision, Summit cites the opinions of Ms. Adam (J.O.'s Case Manager at Summit), Ms. Negvesky, Ms. Gitlitz, and Mr. Domanski that the ABA class was a good environment for J.O.; that J.O. should attend the ABA class full-time; and that J.O. was not ready for the PSD class. (Def. 35 Mot. 19–21) As evidence that it acknowledged the Parents' requests, Summit notes that it placed J.O. in the Parents' requested class—the PSD class—for forty-five minutes each day. (Def. 35 Mot. 20) Summit also points to its acceptance of one proposal from Ms. Parson—that J.O. be allowed to attend the PSD class during "Child-Directed

Centers" time rather than Circle Time. (*Id.* 23)[9]

The ALJ's finding that the Parents' concerns were not adequately considered, however, had adequate support in the record. The Parents collaborated with the CST for a year. ALJ Decision *55. After receiving Summit's evaluation of J.O., the Parents informed Summit that the evaluation was inaccurate based on their own observations and observations of J.O.'s private therapists. ALJ Decision *55–56; (*see* Pl. 35 RSMF ¶¶26, 32) Though hesitant, the Parents agreed to Summit's placement of J.O. in the ABA class. ALJ Decision *56. (*see* Def. 35 SMF ¶36) After many requests by the Parents, the CST finally agreed to allow J.O. to attend the PSD class, but only for forty-five minutes per day. ALJ Decision *56–57; (*see* Def. 35 SMF ¶¶52–53, 65, 72) The CST refused to increase the time J.O. spent in the PSD class, despite multiple requests from the Parents, despite evidence that J.O. was doing better in that class, and despite the opinions of private therapists that the ABA class was not meeting J.O.'s needs. ALJ Decision *57. Given this evidence, the ALJ concluded that Summit did not give careful consideration to the Parents' and private therapists' recommendations or allow the Parents a large measure of participation in J.O.'s IEP.

Summit's cited evidence represents one view of the record: that Summit disagreed with the majority of the Parents' and private therapists' recommendations but incorporated some of them into J.O.'s IEPs. Other evidence cited by the ALJ supports an alternative view: that

---

[9]     Summit also argues that the ALJ erred in finding that Summit "discounted the very possibility that [a videotape of J.O. at a swim class] could be indicative of J.O.'s capabilities and refused to view it." ALJ Decision *21; (Def. 35 Mot. 22) Summit says that K.O.'s testimony contradicts this finding. It does not. K.O. testified, in accordance with the ALJ's finding, that (1) K.O. suggested that J.O. be videotaped; (2) a Summit staff member was "dismissive" of this suggestion and said the parent often manipulates a child in a videotape; and (3) K.O. believes she offered to share the videotape of J.O. with Summit. (Fabian Cert. Ex. XX 47–48) This is, at any rate, a matter not central to the case.

Summit responded to the Parents' and private therapists' suggestions
only with token gestures intended to placate them. It was permissible to
conclude based on the available evidence that Summit did not give
adequate, careful consideration to the Parents' or therapists' views.
Under the applicable standard of review, that is enough.

> iii.   Challenged finding 3: Summit "did not offer J.O.
>        placement in the least-restrictive environment." ALJ
>        Decision *61.

Next, Summit challenges the evidence underlying the ALJ's
conclusion that Summit failed to offer J.O. placement in the LRE. (Def.
35 Mot. 25–29)

First, Summit says the ALJ erred in noting that "[t]he CST
acknowledged through numerous statements that J.O. could function in
a LRE." ALJ Decision *62; (Def. 35 Mot. 25–27) Statements from
Summit's employees show that the ALJ's statement is accurate—CST
members did acknowledge that J.O. could function in a less restrictive
environment. For example, as discussed below, Ms. Diamant suggested
as much. Summit cites statements from other employees that J.O. was
not ready to move away from the ABA class, but that does not render the
ALJ's statement false or her finding impermissible.

Second, Summit argues that the ALJ erred in stating that "[t]he
case manager/LDTC admitted that part of the IEP team wanted to put
J.O. into the PSD class for more time than forty-five minutes." ALJ
Decision *62; (Def. 35 Mot. 27) Specifically, Summit argues that no one
on the IEP team, *apart from the Parents*, wanted J.O. to spend more than
forty-five minutes per day in the PSD class. As Summit acknowledges,
however, the Parents were part of the IEP team. (Def. 35 Mot. 27; Fabian
Cert. 51:12–19) The ALJ's statement could have been more specific, but
it was not erroneous.

Third, Summit argues that the ALJ erred in finding that the "case

manager/LDTC also admitted that J.O. made progress in the PSD class during his forty-five minute session and that [it] was possible that he could have been successful with a longer period of time [in] the PSD classroom." ALJ Decision *62; (Def. 35 Mot. 27–29) Relatedly, Summit takes issue with the ALJ's statement that Ms. Diamant "knew [J.O.] would be successful" in the PSD setting. ALJ Decision *62; (Def. 35 Mot. 28) Ms. Diamant testified that the IEP team "knew [J.O.] would be successful" in the PSD class setting. It is true that she clarified that she meant her statement to apply "[j]ust for that 45 minute chunk."[10] (Fabian Cert. Ex. K 53:8–16) But Ms. Diamant's acknowledgement that J.O. could be successful in the PSD class, even for forty-five minutes, is a significant admission that supports the ALJ's conclusion. Again, the ALJ could have been more specific, but such is not the stuff of reversal.

### iv.  Other challenged findings

Summit challenges other statements of the ALJ. (Def. 35 Mot. 29–33; Def. 35 Reply) These seven miscellaneous contentions, which I discuss briefly, are not persuasive.

First, Summit challenges the ALJ's statement that J.O.'s "teacher and behaviorist [at Summit] strongly controlled whether or not J.O. could demonstrate his mastery of skills." ALJ Decision *20. Seemingly, Summit takes issue with the implication (which I do not draw) that J.O. was not given any opportunity to respond. As Summit acknowledges, the "ABA requires staff members to determine the skill to be targeted, the manner in which it will be presented to the student and how they will assess whether or not the student demonstrates the skill." (Def. 25 Mot. 29) This last part includes

---

[10]    Ms. Diamant also testified, as Summit's own citation shows, (1) that J.O. made progress in the PSD setting, and (2) that it is possible that J.O. could have been successful with another fifteen minutes in the PSD class setting, although she clarified that that "didn't happen" because J.O. "wasn't there" for an additional fifteen minutes. (Fabian Cert. Ex. K 53:8–54:4; Def. 35 Mot. 27)

> the manner in which behavior would be observed, the
> number of consecutive days that J.O. had to exhibit that
> behavior, the number of times that there was an opportunity
> for J.O. to exhibit the behavior, and the percentage of times
> (essentially 80% to 90%) that J.O. had to demonstrate each
> targeted-behavioral component of the selected skill in order
> to move on to the next targeted behavior.

ALJ Decision *19–20. (*See* Def. 35 Mot. 29; Fabian Cert. Ex. P 14–20.)
From the context, it is clear that the ALJ was here referring to those ABA
requirements.

Second, Summit challenges the ALJ's statement that three Summit
employees thought it was "impossible" for J.O. to meet his IEP goals
without attending the ABA class full-time. (Def. 25 Mot. 29–30) Those
three employees, says Summit, never used the word "impossible." (Def.
25 Mot. 30 (citing Fabian Cert. Ex. K 102–103; Ex. P 43–44)) Ms.
Negvesky and Ms. Diamant testified that J.O. needed the ABA class to
expand his skills, that he wasn't ready for the PSD class, and that J.O.
did not and would not make progress in the PSD class. (Fabian Cert. Ex.
K 102–103; Ex. P 43–44) The ALJ's characterization, "impossible," even if
debatable as a word choice, does not give rise to any significant grounds
for reversal.

Third, Summit argues that the ALJ erred in stating that Summit
"created a long, arduous road for J.O. to prove that he could follow one-
step directions." ALJ Decision *20; (Def. 35 Mot. 30–31) That conclusion,
too, is rooted in the evidence cited by the ALJ (as described above).
Summit cites testimony that the ABA classroom was the preferred
environment for J.O.; the ALJ, however, cited conflicting evidence that
the ABA class was not an appropriate environment for J.O. The ALJ's
choice to credit one side of a conflict in the evidence is not erroneous.
*Anderson*, 470 U.S. at 574.

Fourth, Summit argues that the ALJ erroneously concluded that

30

Summit's plan to improve J.O.'s functioning was inappropriate. (Def. 35
Mot. 31–33); ALJ Decision *37–38. Summit's general plan included a
"rule card" that instructed J.O. to "1.) Walk like a big boy; 2.) Stay calm;
3.) Use my words." ALJ Decision *37. (*See* Fabian Cert. Ex. WW 55:3–16.)
As Summit acknowledges, Ms. Toolajian testified that J.O. could not
respond to these instructions because of his dyspraxia. (Fabian Cert. Ex.
WW 55:8–22) She also testified that Summit's goals and objectives were
not appropriate for J.O. because some were too "low functioning" for him,
some weren't "specifically tailored" to meet his needs, and some were
based on inaccurate information (*e.g.*, the name J.O. uses to refer to
himself). (*Id.* 55:23–58:6) The ALJ's acceptance of this testimony was not
erroneous, and her conclusion follows directly from this testimony.[11]

Fifth, Summit challenges the ALJ's finding that J.O. has Childhood
Apraxia of Speech.[12] In particular, Summit cites to the testimony of Ms.
Gitlitz. Ms. Gitlitz, however, did not contradict Ms. Parson's diagnosis of
CAS; Ms. Gitlitz merely declined to definitively state that J.O. suffers
from CAS. (Def. 35 Reply 3) And even if the testimony were contradictory,
I would be constrained to defer to the credibility determinations of the
ALJ. *See D.K.*, 696 F.3d at 243. Summit also cites to the report from CSH
that indicated J.O. had difficulties in both expressive and receptive
language skills. (Def. 35 Reply 3–4) This, says Summit, renders the
diagnosis indefinite because, as Ms. Gitlitz explained, a child with CAS
would have receptive language skills that are higher than his or her
expressive language skills. (*Id.*) The 2009 report of the CSH team did not

---

[11]    Summit cites several aspects of its plan for J.O. to argue that it was
appropriate and to fault the ALJ's conclusions. I use the rule card as just one
example to show that the ALJ's conclusion is supported by evidence and
reflects one plausible view of Summit's plan. As stated several times, Summit
cannot prevail by simply citing evidence that might have pointed to a contrary
conclusion.

[12]    More specifically, Summit challenges the Parents' argument that J.O.
has CAS. Because it is the ALJ's findings, and not the Parents' arguments, that
are at issue, I interpret Summit's argument to apply to the ALJ decision.

indicate either way whether J.O. had CAS, nor did it compare J.O.'s receptive and expressive language skills. (Fabian Cert. Ex. H) The ALJ's choice to rely on the testimony of Ms. Parson and other experts was not erroneous.

Sixth, Summit argues that the ALJ erroneously considered evidence of J.O.'s improvements at MCA in determining that Summit's program for J.O. was inappropriate. (Def. 35 Reply 5–6) Summit argues that this was impermissible "Monday Morning Quarterbacking" because the permissibility of Summit's IEPs cannot depend on events that had not yet occurred. Here Summit has a glimmer of a legal argument. But even Summit's cited case, *Fuhrmann on Behalf of Fuhrmann v. E. Hanover Bd. of Educ.*, 993 F.2d 1031, 1040 (3d Cir. 1993), does not stand for the proposition that a student's later progress may not be considered *in any way* in evaluating a previous IEP. The issue is always whether the IEP decisions were proper and reasonable at the time. After-acquired evidence can be considered, but "carefully," and only as it bears on that issue. That is, "[s]uch after-acquired evidence, such as information received through the experience of an alternative placement, should be used by courts only in assessing the reasonableness of the district's initial decisions regarding a particular IEP." *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995) (interpreting splintered decision in *Fuhrmann*). Here, the ALJ properly limited herself to considering the MCA progress as evidence that J.O.'s initial IEP was inappropriate. ALJ Decision *42–45.[13]

Seventh, and finally, Summit disputes the evidence that J.O. made progress at MCA. Specifically, it questions testimony from Ms. Harriet

---

[13]    It must be said, however, that the ALJ came close to the line of impermissible reliance on after-acquired evidence, though not in a manner that calls her conclusions into doubt. Caution must be exercised in this area.

McCarter, the former Director of the MCA program. (*See, e.g.*, Fabian Cert. Ex. ZZ 67:24–69:16) As Summit does not cite to any contrary evidence, I accept the ALJ's findings regarding J.O.'s progress at MCA.

### V.   CONCLUSION

Accordingly, Defendant's motion for summary judgment as to its appeal of the ALJ's decision (part of ECF No. 35) is DENIED in part. The June 5, 2012 decision of Administrative Law Judge Evelyn Marose is AFFIRMED. I reserve ruling on the remainder of Defendant's motion for summary judgment in ECF No. 35, pertaining to the Plaintiff's Counterclaims III, IV, and V.

Dated: July 27, 2015

Hon. Kevin McNulty
United States District Judge